Case number 253037, Sofidel America v. Occupational Safety and Health Review Commission. Argument not to exceed 15 minutes per side. Mr. Kerfee, you may proceed. Good morning, Your Honors. If it pleases the Court, William Kerfee, on behalf of Petitioner Sofidel, I have reserved five minutes for rebuttal. We're here today to ask this Court to reverse the administrative law judge's decision that the standard at 29 CFR 1910.147, which is commonly referred to as the lockout-tagout standard, is applicable to the operations at Sofidel. We contend they are not. And we contend that the judge's decision was arbitrary capricious and abuse of discretion and not in accordance with existing law. The judge used a term here that doesn't exist anywhere in the regulations, the interpretive bulletins or the standard. She said this was pre-production. Once a machine stops during production because of the production itself, that is pre-production, and you are no longer engaged in production. Well, I mean, but that is the point. The pre aside, that is the point, that this is not akin to the example in the notes, I think, for this regulation where somebody is remotely adjusting a printing press as it's running. I mean, this is you're stopping the machine altogether, and it's an unjamming. And that, I mean, that seems squarely to fall within the regulation for, to be servicing as described in the regs. I mean, they specifically talk about, you know, unjamming. So why isn't that correct? Well, and they also talk about unjamming under the minor servicing exception as well. There's the confusion. And there's a case, Reynolds, the Reynolds paper case indicates that if a machine jams on the actual product, if the product that's being produced causes the jam, that falls under the minor servicing exception. And to get to your point about, for example, in the printing industry, and the interpretive bulletin indicates if during the printing process the paper jams, that's a minor servicing exception, provided a guard hasn't been removed. But the purpose of the lockout-tagout standard indicates that you cannot have unexpected startup that may cause damage to us. That's precisely what happened here. 100%. He himself said he was surprised. So how is that not like an archetype of unexpected startup that causes harm? Well, but again, we had an employee misconduct defense, which the judge dismisses, which is also an abuse of discretion. Well, that's a different question about whether it's authorized and so on. But simply the question whether the situation as the machine is sitting there, and Mr. Hill's approaching it to unjam it, whether that presents the circumstances described in the regulation, that we have an energized machine that could start unexpectedly with the potential for harm, that seems exact. I mean, like, undisputedly, that's exactly what was present and what indeed materialized. Well, I understand this correctly. These machines are designed so that there's not unexpected startup. The unexpected startup here was Mr. Hill saying, I told the other guy who's with me, Mr. Perkins, in violation of the two-person job. Right, they're doing a two-man job. No two-person job. I mean, here, I'll grant you this. The unexpected part is really kind of a matter of degree. It's just how quick this thing got going. And that caught Mr. Hill by surprise, according to the testimony. But it was, the unexpectedness could be measured in milliseconds, but that made the difference between a degloving injury and no injury, apparently. But again, the situation here was, it didn't make any sense. Because Mr. Hill said, I told him to go ahead and hit the reverse jog button. And I didn't know he was going to do it right then and there. That's the unexpected part. Well, in any event, it happened. Exactly what the rule says. But he also indicated that he knew when you hit that reverse jog button, it starts up. It'll start up the machine right away. He knew that. He said he was surprised. He used that word. But he also indicated, and this is where it's inconsistent, particularly with the two-man jog all the time. Well, if he two-man jogs all the time, then he knew this was going to happen. And he also indicated, as I said, he knows when you have to maintain pressure on the reverse jog button, once you remove the pressure, it stops. And that's why I say it was designed in such a way that you cannot reach the point of operation. The employee would have to push the jog button, maintain contact with the jog button, and then deliberately stick their hand in there. Well, that's why two-man jogs are, you know, the employer says they're prohibited. Exactly. But I think that the government's argument is, the agency's argument, is that de jure prohibited, yes, de facto authorized rampant. Everybody knew about it. And I mean, de facto, they're letting it happen. And it happens. I mean, there's legions of testimony to that effect. Well, there wasn't. Actually, what happened was all the supervisors, all the managers say it's prohibited, it's always been prohibited. We never saw it happen. Except all the, you've got three different supervisors who said they did it all the time. And they, you know, in fact, with Mr. Hill, you know, his own boss was doing this with him. According, I mean, look, we're not here to, you know, assess the credibility of that testimony, but there was plenty of it. But there was not. So why doesn't the agency have plenty of evidence? There was not substantial evidence of that fact. In fact, the supervisor, Mr. Bixler, testified he never did that. And the only testimony is Mr. Hill, who said it was three times. One was Mr. Bixler, who said it didn't happen. The other two employees were never called. You know, and we also had. You're arguing the merits of what occurred. Shouldn't you be focusing on whether the ALJ's opinion was deficient and what was wrong with the administrative law judge's analysis as to whether we can sustain what the ALJ decided? Shouldn't that be the focus of our attention? I agree. I was trying to answer the judge's . . . Yeah, I guess I paid it. No, I'm just kidding. I was answering his . . . That's . . . I mean, let's talk . . . I echo Judge Clay's question. Again, the standard, as I mentioned, talks about on-jamming as a minor servicing exception. These machines, because it's toilet paper, it's tearing all the time. And you mentioned on-jamming. On-jamming, the judge kind of used that as a catch-all. When it's not just jamming, it's also paper breaks, paper tears, wraparounds, roll-arounds. There's various things that happen with this toilet paper. And these machines operate at a 40% capacity, meaning 60% of the times there's problems. And they factor that into their pricing for the equipment. But when she said pre-production, when the machine shuts down, well, then there's no need for lockout, tagout if the machine's not operating. And the whole issue with the employee . . . Well, it's still energized. But to lock it out and tag it out, you wouldn't be able to continue production. And that's the purpose of the minor servicing exception. And that's what the various case law and the interpretive bulletin say, that you need to be able to continue the production. And to say if it's not . . . That happens all the time in various situations. It starts and stops, but it's not continuing. You can go ahead. Correct. Because the material itself . . . Why does it say on-jamming in the first section that you have to have it, and on-jamming again in the minor servicing exception? It's there twice, and we're supposed to guess which one we use? Well, we designed it under the first one, where it says, only if there is unexpected startup that can cause an injury. And those machines are designed so that never occurs. There cannot be unexpected . . . Especially when you have to push the button and hold it, there's not unexpected startup. She takes the position that you can't use the two-person jogging defense because the supervisors knew that they were not locking out and tagging out. Therefore, once the company knows, then you cannot claim that defense. But getting back to your point about the evidence, and the secretary points out it was rampant two-person jogging. No, it wasn't. There was even an employee complaint or an employee . . . Did she even make a finding? I mean, there's plenty of evidence in this record that some people said that this happened all the time and the supervisors knew about it, and some people said, no, it never happens. Did she make a finding on that question? No. No. She just took the point that because you knew, you, the supervisors, knew there was not locking out and tagging out, you don't get the defense of two-person jogging. But the only testimony was that of the compliance officer who recalled after looking at her notes that they talked about two-person jogging. There was no testimony from any of the supervisors directly. Mr. Bixler denied it, and there was no evidence of when, Mr. Hill's statement, these occurred. Yes, it occurred before 2019. That testimony is clear. It stopped after 2019, and there was in evidence the standard itself, and there was discipline. Whether there was . . . Whether multiple witnesses testified about this rampant practice of two-man jogging is one thing. Whether the ALJ cited all that testimony is another question. But I do not read your brief to make a Chenery-type argument. To make a what type, I'm sorry? To make an argument that the ALJ's opinion failed to cite some of the testimony that the agency's relying upon. I don't see you making a procedural argument that the, you know, even if there's tons of evidence to this effect in the record, the ALJ did not cite the specific testimony that would support some of these determinations. I see you just arguing the merits throughout as opposed to that procedural point. Well, and again, she never got to it, though, because she just said you knew they weren't locking and tagging out. Therefore, you don't get the . . . She didn't address it. It's like a half a page. Okay. All right. Well, your red light's on. I'm not presiding. Can I ask one quick question? I have a question on remedy. So let's say we agree with you. We think the ALJ's ruling can't stand. You ask us to vacate, but then do we also remand it to the agency? Well, we would ask that it just be reversed. We're not asking for a remand. We're asking it for reverse due to the abuse of discretion and not in compliance in accordance with existing . . . I don't think we reverse agencies. I think we would vacate the order. Vacate the order. But I'll ask . . . I'm sorry? I'll ask the council on the other side. But my question is whether vacate and remand usually go together and whether there's a reason to think this is a vacate only as opposed to a vacate and remand. The remand would be remanded to dismiss the citation. I mean, that might be right. That might be what we need to do. That would be the remand, in my opinion. Yes. Thank you. Thank you. And we'll hear from the respondent. Good morning, judges, and may it please the court. I'm Joseph Quick for the Secretary of Labor. If we would like to start briefly discussing the remedy in this case. I do believe that this panel has a jurisdiction to rule based on the evidence in the record on other grounds other than the ALJ's ruling. Wait, how can we do that? I mean, it's just a black letter administrative law principle. No post hoc rationalizations by agency lawyers. And that's what you're trying to do. Like, we can only affirm the agency on the agency's own rationale. But to that point, I do think there's substantial evidence in the record for the ALJ's ruling. But I do think the Campbell decision allows this court the ability to rule, to affirm the citations on those grounds. Is that a case involving an agency? That was a case involving a district court. Yeah, I do believe so. Yeah, I do think that's the case. So the Chenery principle is applicable to agencies, not district courts. Yes, Judge. And to that point, the remedy would be to remand for findings on the issues on the other grounds. So if we vacate, if we say that this order was insufficient, then you get another bite at the apple? And why? Well, it's a remand to the ALJ to make further findings on the other issues raised by counsel. I think the ALJ ruled based on the action not taking place during normal production operations. But in this regard, the ALJ would have to make findings on the other elements in regards to the minor service and exemption raised by counsel. I see. Well, when you say we should remand, does that mean you're conceding that the ALJ's opinion was deficient? Absolutely. Absolutely not, Judge. I'm not saying that this court should remand. I do think that this service did not take place during normal production operations in line with the ALJ's decision. Can you give us that distinction that your friend on the other side makes between the servicing on the one hand, which is to which LOTO does apply? Servicing is when somebody is putting their hands in a dangerous place and it's not during production as opposed to the minor servicing. I read it in here. I just can't find it as I'm sitting here. What's the difference between those two again? Yes, Judge. To that point, I do think there is some missing up as far as applicability is concerned. When the standard is being applied to servicing or maintenance during normal production operations, the inquiry is simply whether there is the potential risk of unexpected energization. The normal production operations clause itself is a limiting principle in a lot of ways for the secretary, meaning the secretary can only cite under the enumerated circumstances under the subsection. What's the distinction between minor servicing, which is what your friend says was happening at the time of the injury here, versus servicing? The distinction is simply the minor servicing applies during normal production operations. That's when the printing press is still running. And in the red brief, there's this example of remotely adjusting stuff while it's still going. It's still going. So the minor servicing is it's still performing its function actively. Well, the minor servicing is it's an exemption that the employee would argue only in the circumstances that the secretary is applying the standard during normal productions operations. If the secretary is applying the standards outside of normal production operations, there is no need to make a showing of minor servicing. So it's not cutting the rolls. It's outside those operations is your position. Absolutely. If the servicing is outside of normal production operations, then the showing is simply that, no, there was no risk of unexpected energization. It seems like really maybe the crux of the dispute here in front of our court is, I mean, I do want to commend this red brief. You know, I mean, the agency does an admirable job of laying this out step by step for the generalist reader, such as me, and I appreciate that. And the agency lays out considerable, you know, describes considerable testimony to the effect that de facto, this two-man jog stuff was rampant. And so one could infer not only knowledge, but de facto authorized, which potentially could check the boxes for both of these citations that you need to check. But I mean, I think one question you've gotten today is whether the ALJ actually cites all the testimony that the brief cites, right? And so it seems like she doesn't. And so what do you think we ought to do about that disparity between, is it a waiver issue that your opponent has not anywhere cited the case called Chenery? And I'm not aware of it being called jurisdictional. Is it a waiver issue as to this procedural point or whatever you want to call it? Or are you, what's your position here? Well, first it would be a waiver issue because the Soffitel only gets to the merits of the case. I mean, in all of their briefing, as you mentioned, Judge, like we're getting to the merits of the case. So there was never this procedural argument that I'm hearing today that the case should be remanded for other findings or that the ALJ's decision was deficient on procedural grounds. There is, of course, the arguments that the ALJ- I mean, it's not that it's deficient on procedural grounds. The decision is deficient. But if a district court writes a deficient opinion, but there's support in the record, we can reach out and get that. We review judgments of district courts, not opinions. But with agencies, we don't so much care about their judgment. We're reviewing their opinion. Did they show their work? Did they make a reasoned decision? And while the ALJ may have been able to come to this conclusion, as you show, I think our job is to decide whether the ALJ did that. Now, your opponent doesn't really raise that. So I don't- I share Judge Kethledge's confusion about what we're supposed to do. I mean, one could say that it seems on the record that the ALJ's decision was amply supported by evidence, but she didn't cite it very much. So it's- we're scratching our heads here. What do we do? Well, I think the- But the absence of the citations isn't really an argument. Yes, Judge. In the blue brief, so. I think the court affirms, based on the ALJ's decision, because I do- it is the Secretary's position that this service did not take place during normal production operations, which is the ALJ's ruling. I think- That's an interpretive point, right? And, you know, I'll allow that. That seems like a pretty good interpretation. Yes, Judge. You know, it's not producing anything when it's shut down sitting there, as opposed to it's running and somebody's tinkering with it somehow while it's running. So, yeah. Well, yeah. To that regard, I think the ALJ also mentioned that they're not only to shut down, but set up activities that we get from the West Vago case. The activities that took place in this regard when in unjammed and rewinder were extensive, that I do think there's substantial evidence that you could label those activities as set up activities. I mean, this machine, like, sometimes it was down for up to 80 minutes. Sometimes it requires specialized workers to complete the unjamming. Yeah. At which point, I mean, all the way up to maintenance personnel. This is a large industrial sized machine. I mean, this is not like a small printing press. This machine is the size of a New York apartment, just a small apartment. So, in that regards, this servicing activity is outside of a normal productions operation. And along the same lines, as far as applicability, I do think counsel mentioned that the worker himself was prepared. So, to say that there was no unexpected energization. An employee's subjective awareness does not control whether the lockout tagout applies. So, I'm sure this court knows this is an objective inquiry. So, just along those lines, I do think these citations are obvious for a lot of the points made today. There's no dispute that the cited activity, two-man jogging, did expose workers to the unexpected risk of energization. And we know that to be the case because Salfordale had it prohibited for that very reason. We have testimony to that end. So, just based on, you know, the record evidence, I do believe that these citations should be affirmed outside of, obviously, the procedure issues that the panel raised this morning. That's a big outside, but we're trying to work through it.  Well, I do think if there are no other questions, I will yield the remainder of my time. All right. Thank you very much. Again, the judge doesn't even get to, the ALGO doesn't even get to the issue of the two-person jogging. She decides that lockout-tagout applies. But again, our contention is it doesn't because there's no unexpected startup that would expose an employee to hazard. She indicates the only unexpected startup is the employee telling the other employee, hit the jog button, oh, I didn't know he was going to do it right then and there. That's an intentional act. An intentional act, an employer cannot be responsible for an intentional act. She even indicates it doesn't matter if there's one or two employees. She dismisses all of that. She's not concerned about whether or not there's two-person jogging. Her whole focus is, does lockout-tagout apply? And if lockout-tagout applies, you didn't apply it because these employees weren't authorized. They were affected, but they weren't authorized. And because they weren't- Are you saying that or are you saying what she was saying? Because I thought she was saying they were authorized, but yet they weren't trained. They clearly were trained. I don't think there was any question they were trained, but they were trained. She wasn't too impressed by the single PowerPoint slide, et cetera. But are you- I'm just trying to understand what you just said. Are you- Is that you saying they're affected, not authorized? Because I thought she said they were authorized. She did say that. And that one single PowerPoint you're talking about was the no two-person jogging. No, there was extensive in the record shows there was training on lockout-tagout. And the lockout-tagout says you have to train two people. You have to train affected employees and authorized employees. These are affected employees. She said, no, they're not. They're authorized. And we had- As opposed to whether it's a rampant practice and it's sort of a wink and a nod. She didn't care about that. Again, she only is looking at- She took it, you could argue she took it for granted based on the record. But what I hear you arguing and I mean, these are legitimate arguments. I hear you making interpretive arguments, not evidentiary arguments. And that's- It's tough to just dive into this topic on page one of a brief without getting acclimated to it. But the arguments in your brief seem to me to be interpretive arguments and not evidentiary arguments. Is that fair? Well, it has to be substantial evidence. And the substantial evidence that came out other than the compliance officer refreshing her memory from her notes that they talked about lockout-tagout. Substantial evidence was- or talked about two person jogging. Substantial evidence was it doesn't occur. Well, OK. But- And it's prohibited. It seems like you're- OK, well, it seems like you're making interpretive arguments rather than evidentiary ones. But it's OK. It's all right. You know, this is tricky stuff. Well, and in our mind, it shouldn't be because again, those machines were designed so that lockout-tagout is not required under those circumstances. But to hold that if it's not in production, that therefore lockout-tagout applies, then they can never fix the machine. They can never get back into production. And again, these machines only operate at a 40% capacity. They know they're going to stop and the material itself, the toilet paper, is going to jam it. And Mr. Hill was not a credible witness. He sort of tipped his hand at the beginning saying, well, they make crappy products. And he was fired for doing this. Well, but I mean, the red brief kind of calls you out a little bit on that. He didn't get fired for this episode. He got fired when he did it again, apparently two months later, which is mind boggling. But apparently that happened. Exactly. But he was disciplined for this because they go through the three-step process. He wasn't terminated because of this by any means. And, you know, he got caught doing it again. I think it's sort of more to the agency's point that it's like this is just nonstop. He was disciplined initially and they said they go through a progression of discipline. You don't necessarily get fired right away. And they tried to keep out the employee statement. There was another employee statement that was anonymous that said, we don't two-person jog. It's been prohibited. We never do it. They tried desperately to keep that out. And it wasn't even provided to us during the initial discovery. And that comes out in the record. But again, she didn't care about that. She didn't care about the two-person jogging. It was only that these were not authorized employees. Therefore, it doesn't matter. I'm not even looking at that. Thank you. Thank you very much. And the case shall be submitted.